Frank DRAGO, Plaintiff,

v.

A/S INGER, Defendant.

A/S INGER, Third-Party Plaintiff,

v.

DANIELS & KENNEDY, INC., and Illinois Atlantic Corp., Third-Party Defendants.

Civ. No. 16669.

United States District Court
E. D. New York.

May 31, 1961.

Pyne, Smith & Wilson, New York City, for defendant and third-party plaintiff A/S Inger, William A. Wilson, Albert Robin, New York City, of counsel.

Haight, Gardner, Poor & Havens, New York City, for third-party defendant Ill. Atlantic Corp., David P. H. Watson, New York City, of counsel.

Charles G. Tierney, New York City, for third-party defendant Daniels & Kennedy, Inc., Raymond C. Green, New York City, of counsel.

ZAVATT, District Judge.

The plaintiff, Frank Drago, is a longshoreman employed by the third-party defendant, Daniels & Kennedy, Inc., a stevedoring company. On January 4, 1956 he was aboard the S. S. Elin Hope (owned by the defendant and third-party plaintiff A/S Inger) which was tied up to a pier at the foot of Dikeman Street, Brooklyn, New York. He was working aboard this vessel as a winchman and, in that capacity, had been operating the starboard steam winch at hatch No. 2. Immediately before the plaintiff left the vessel to go to lunch, he turned off the winch steam. Upon his return from lunch he started up the steam again and thereafter left it unattended and walked over to hatch No. 1 where he was directed by his hatch boss, another employee of the stevedoring company, to cut off the winch until "the Number 1 hatch caught up." In the process of cutting off the steam to this winch his foot was crushed by the moving piston. On the trial to the court and a jury the plaintiff and his witnesses testified that there was grease and oil on the deck in the vicinity of this winch; that it had spilled on the deck when an employee of the vessel greased the winch and applied oil to its moving parts at various times that morning and that oil had also spurted on the deck from the winch while it was operating. The plaintiff claimed that he slipped on this grease and oil as he was approaching the winch for the purpose of cutting off the steam and that, when he slipped, his foot came to rest in the area over which the piston moved; his body struck the operating lever of the winch, thereby activating the piston which crushed his foot. He claimed further, that a safety device, a pin, designed to keep the lever in neutral, was missing from the winch; that he had placed a piece of wood under the lever to hold it in neutral position while he left the winch to walk over to No. 1 hatch and, that as his body struck the lever the piece of wood was dislodged, the lever went down and thereby activated the piston. He sought to recover against the defendant on the theories of unseaworthiness and negligence. The defendant, owner of the vessel, impleaded the stevedoring company, Daniels & Kennedy, and the time charterer, Illinois Atlantic Corp. Only the claims of the plaintiff against the defendant were tried to the court and jury, the parties having stipulated that the claim over against the impleaded defendants would await the outcome of the jury's verdict and any issues that remained would be determined by the court. The court submitted to the jury, pursuant to Rule 49(b) of the Rules of Civil Procedure, 28 U.S.C.A., written interrogatories which were answered by the jury as follows:

"1. Do you find for the plaintiff on the ground that the ship was unseaworthy? No.

"2. Do you find for the plaintiff on the ground that the defendant was negligent? Yes.

"3. Did you reduce the plaintiff's damages because of his contributory negligence? Yes.

"If so, by what percentage? 75%."

The jury returned a verdict for the plaintiff against the defendant in the sum of $4,500. Thereafter, the third-party claim of Inger against Daniels & Kennedy and Illinois Atlantic was tried to the court without a jury.

The vessel had completed a voyage from Canada where it had taken on large quantities of paper purchased by The News Syndicate, Inc., (not a party to this action). The News engaged Daniels & Kennedy to unload the cargo in keeping with their blanket stevedoring agreement dated April 3, 1952. The time charter between Inger and Illinois Atlantic, dated January 30, 1950, was in full force and effect on the date of the accident. It is in the form of a New York Produce Exchange Government Time Charter and provides, inter alia: "Charterers are to load, stow, and trim the cargo at their expense under the supervision of the Captain." At the trial, Illinois Atlantic conceded that this provision contemplated not only loading but also discharging cargo, so that under that agreement Illinois Atlantic had the obligation to unload. Nevertheless, Illinois Atlantic did not discharge the cargo itself nor did it directly engage anyone to do so in its behalf. Rather, The News as consignee engaged Daniels & Kennedy to discharge the cargo.

The paper which was transported from Canada to Brooklyn aboard the vessel, under a bill of lading signed by the master, had been purchased by The News from Quebec North Shore Paper Co. North Shore had entered into a "contract of affreightment" with Illinois Atlantic, the time charterer, dated January 5, 1950 and in full force and effect on the date of the accident. Under that agreement the shipper, North Shore, was required to load and stow the cargo aboard the vessel in Canada. The agreement contemplated that the consignee, The News, although not a party to that agreement, would discharge the cargo at its own expense. Presumably, under the purchase and sale agreement between North Shore and The News, the seller's obligations so far as delivery was concerned ended when the cargo was loaded aboard the vessel thus casting on the purchaser, The News, the burden of unloading its own cargo.

### The Jury's Verdict

■■ The jury's verdict, though supplemented by its answers to the interrogatories, is somewhat ambiguous. For example, the exact manner in which the shipowner and the longshoreman were negligent is not specified. While these specifications are not necessary for the verdict in the suit by the longshoreman against the shipowner, they may be material to the shipowner's claim for indemnity asserted against both the time charterer and the stevedore. See Weyerhaeuser S. S. Co. v. Nacirema Operating Co., 1958, 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491. Therefore, in order to resolve the third-party aspects being tried to the court alone, the court must make additional findings of fact which must not be inconsistent with the findings expressed in the jury's answers to the interrogatories or necessarily implied in the jury's verdict in the primary suit. See Weyerhaeuser S. S. Co. v. Nacirema Operating Co., supra.

The plaintiff's legal theories of negligence and unseaworthiness were premised on common factual allegations: that the deck was covered with grease and oil and that the safety pin for the operating handle of the winch was missing. While the jury's verdict is ambiguous, it seems clear to me in light of their finding that the plaintiff was contributorily negligent to the degree of seventy-five per cent, that the jury rejected plaintiff's evidence and argument that there was grease and oil on the deck; that he slipped thereon; that his foot came to rest as he claimed; that he fell over the lever as he claimed. Rather, the answers to the interrogatories and the general verdict returned indicate that the jury accepted the defendant's theory of the accident, i. e. that when the plaintiff was told to close off his steam he stood up on the piston rod and leaned over the operating handle in order to reach the steam

valve on the opposite side of the winch; that proper procedure and due care called for the plaintiff to walk around his winch, in order to reach the shut-off valve; that in leaning over the winch plaintiff lost his balance, slipped, depressed the operating handle with his body as he fell, and thereby activated the piston which crushed his toes because he had placed his foot on the piston rod in the first place. Implicit in the jury's finding of negligence on the part of the shipowner is a finding that the shipowner did not provide a safety pin which, if provided and used, would have avoided the accident.

I am convinced that this is what the jury determined. In any event, such findings are not inconsistent with their answers and their verdict. As I must make additional findings, those are the findings that I make. One further refinement may be necessary: did the shipowner, through its employees, know that the safety pin was missing, or was the shipowner negligent in that it should have known? The plaintiff testified that he told no one about the missing pin. Some further evidence on this point was provided by the second mate, Sverre Johnsen, who testified that at all times the pin was hanging from a metal chain on the winch. The jury evidently disbelieved Johnsen, but it is a big jump from disbelief of the presence of the pin to a finding that Johnsen, and therefore the shipowner, affirmatively knew that the pin was missing and chose to do nothing about it. I find that the pin was missing; that it is more reasonable that Johnsen did not know of the missing pin and that the shipowner's negligence lay in not correcting a dangerous condition that it reasonably should have discovered.

### Legal Theories of the Parties

The shipowner has sued over against the time charterer and the stevedore. The shipowner's theory against the charterer is that under the charter party the charterer assumed the obligation to unload the vessel and that implied in that undertaking is the promise that the unloading would be done safely and that for the breach of that promise the charterer would idemnify the shipowner for any losses suffered by the latter.

The shipowner's theory against the stevedore is that the stevedore warranted that it would accomplish its expert, professional services in a workmanlike manner and indemnify for any loss occasioned by the breach of that warranty. This warranty is implied in the following covenant:

"The Contractor will provide all necessary labor and services to discharge * * * paper from ships * * * in a prompt and efficient manner."

Although the stevedore was hired by the consignee of the cargo rather than by the shipowner and, therefore, there was not the contractual privity between shipowner and stevedore that there is between shipowner and charterer, the shipowner argues that it is the third-party beneficiary of that warranty and its attendant indemnity provision.

The third-party defendants, the charterer and the stevedore, have of course cross-claimed against each other seeking indemnity should the shipowner be successful in its suit. The charterer's basis for recovery is an indemnity provision in the stevedoring agreement entered into between the consignee of the cargo and the stevedore. By the terms of that agreement, the stevedore promised to indemnify the consignee and its "subsidiary and affiliated companies." The charterer asserts that it is such a company.

For its part the stevedore makes general allegations that, if it is required to indemnify the shipowner, it will be because of the primary negligence of the charterer and therefore under the common law theory of primary-secondary wrongdoing it would be entitled to be indemnified by the charterer.

Having set forth the claims and contentions of the parties, it is possible to simplify their analysis. It will be seen that the shipowner's basic grievance is

with the stevedore as the party actively engaged in unloading the vessel. Under the shipowner's theory the liability of the charterer is derivative in the sense that the charterer's liability depends on a finding that the independent contractor, engaged to discharge the obligation of the charterer under the charter party, did not do its job in conformity with its undertaking. It seems preferable therefore to discuss the claim of the shipowner against the stevedore first and leave for later consideration the liability of the charterer.

### Shipowner v. Stevedore

■ Under the principles announced by the Supreme Court in Ryan Stevedoring Co. v. Pan-Atlantic S. S. Corp., 1956, 350 U.S. 124, 76 S.Ct. 232, 100 L. Ed. 133 and subsequently explained and expanded by the Court, a stevedore warrants to a shipowner that it will do its job in a workmanlike manner and with reasonable safety and that any loss resulting from breach of this warranty will be borne by the stevedore. In Ryan, the shipowner hired the stevedore but the parties did not execute a formal contract. What agreement they did have was to be found in letters which contained neither an express undertaking by the stevedore to do the work safely nor a promise to indemnify for a failure to do so. Nevertheless, the Court found the intent of the parties to encompass such an undertaking, characterizing this implied-in-fact warranty as the "essence" of the agreement and compared it to the warranty of a manufacturer that its product is sound. In Crumady v. The Joachim Hendrik Fisser, 1959, 358 U.S. 423, 79 S.Ct. 445, 448, 3 L.Ed.2d 413, there was a formal contract between the charterer and the stevedore in which the stevedore promised "to faithfully furnish such stevedoring services." The Court said that the shipowner was the third-party beneficiary of the warranty of workmanlike service contained in that covenant and the right to indemnity as an incident of the warranty. Most recently in Waterman S. S. Corp. v. Dugan & McNamara, Inc., 1960, 364 U.S. 421, 81 S. Ct. 200, 201, 5 L.Ed.2d 169, the stevedore had been hired by the consignee. The terms of the contract are not specified [1] in the Court's opinion which treats the case as controlled by Ryan and Crumady and designates the shipowner as the third-party beneficiary of the contract between the consignee and the stevedore.

### Has the stevedore breached its warranty?

■ Although the stevedore's obligations are contractual, the determination of whether the stevedore has breached its warranty is generally made by reference to the law of torts.[2] Negligence on the part of the stevedore has been held without exception to constitute a breach of its warranty. Therefore, the question can be conveniently put in terms of whether the stevedore was negligent, although a negative answer would not necessarily be determinative because breach of warranty is a broader term than negligence.[3]

The earlier cases gave some support to the contention that the warranty extended only to the handling of cargo. But in Waterman the Court surveyed its prior opinions and said:

"This warranty of workmanlike service extends to the handling of

1. The specific terms of the contract were not relied upon by the shipowner in the proceedings below. See King v. Waterman S. S. Corp., 3 Cir., 1959, 272 F.2d 823, at page 825 note 1.

2. Cf. Ryan, 76 S.Ct. at page 237: "The shipowner's action is not changed from one for a breach of contract to one for a tort simply because recovery may turn upon the standard of the performance of petitioner's stevedoring service."

3. See Booth S.S. Co. v. Meier & Oelhaf Co., 2 Cir., 1958, 262 F.2d 310. This seems to be the only case in which a shipowner was allowed indemnity in the teeth of a finding that the contractor was not negligent. The contractor in that case was a ship's mechanic and not a stevedore.

cargo, as in Ryan, as well as to the use of equipment incidental to cargo handling, as in Weyerhaeuser * *. The warranty may be breached when the stevedore's negligence does no more than call into play the vessel's unseaworthiness. Crumady * *."

81 S.Ct. at page 201. In Crumady the ship provided an unsafe winch-boom system, but it was the negligent manner in which the rig was actually used by the stevedore that triggered the accident. In this respect it is hard to distinguish our case from Crumady. However in Crumady, as in the generality of cases, the stevedore was found negligent via respondeat superior when longshoreman A negligently injured longshoreman B— both longshoremen being employees of the stevedore. Under such circumstances, the shipowners is generally liable to B either because A's negligence brought about an unseaworthy condition or brought into play unseaworthiness already existing. Often the shipowner is liable in negligence in addition to any liability for unseaworthiness.

In the instant case, it was the plaintiff's own negligence in conjunction with the negligence of the shipowner in failing to provide a safety pin that brought about the plaintiff's injury. In such a case, is the plaintiff's negligence in the manner in which he performed his job attributable to the stevedore so that that negligence operates to breach the stevedore's warranty? The stevedore has argued that the shipowner is not entitled to impute that negligence to the stevedore because the shipowner has already received a benefit from the finding of the plaintiff's negligence in that the plaintiff's recovery was reduced by seventy-five per cent. The stevedore also benefits because the plaintiff's recovery is the measure of the shipowner's loss and therefore the outer boundary of the stevedore's potential liability. The few cases that have presented the opportunity to consider this point tend to support the stevedore's position. In Trenkle v. Compagnie Generale Transatlantique, D.C.S. D.Cal.1960, 179 F.Supp. 795, a longshoreman fell into a hatch when he lost his balance on a narrow passageway. The ship was unseaworthy in that there were no guard rails along the passageway. The shipowner contended that the longshoreman was not a suitable worker because as a former prize fighter he was punch drunk, or, in any event, that he negligently tripped over his own feet. The court thought that it would be a breach of the stevedore's warranty if it provided unsuitable longshoremen but found that this longshoreman was experienced and competent. It went on to hold that, even if the longshoreman were negligent in a manner that caused his injury, that would not be enough to fasten liability on the stevedore. In Calderola v. Cunard S. S. Co., 2 Cir., 1960, 279 F.2d 475, 477, a longshoreman was injured when he slipped on grease on a ladder he was descending. He had discovered the grease a "moment or two" before on his trip up the ladder. The jury had found for the longshoreman against the shipowner on the theory that the grease rendered the ship unseaworthy. The trial court, sitting without a jury, then granted the shipowner indemnity from the stevedore. This latter judgment was reversed on appeal. The Court of Appeals held that the stevedore's warranty to perform its work with reasonable safety was not breached under the facts because the grease on the ladder was only a recent condition and "this knowledge acquired by the plaintiff so short a time before he slipped was insufficient to put the stevedore on notice of the condition and give it an opportunity to remove the grease or to have the ship's crew do so before the accident." 279 F.2d at page 478. It did not consider whether the longshoreman was contributorily negligent in coming down a ladder he knew was greasy, or in the manner in which he descended,[4] and if he was, whether that negligence would be sufficient to constitute a breach of the

4. See Santomarco v. United States, 2 Cir., 1960, 277 F.2d 255.

stevedore's warranty to do its work with reasonable safety.

■ Having raised the problem of whether the injured longshoreman's own negligence is sufficient to constitute a breach of the stevedore's warranty, it is possible to finesse the problem via the dictum suggested by Calderola, i. e. that the stevedore has a duty to remedy, or have the ship's crew remedy, a dangerous condition that exists for a period sufficient for the stevedore to have constructive notice thereof.[5] The missing pin was a condition which existed, not for a few minutes, but from the time the longshoremen came aboard at about 8:00 A.M. to about 1:15 P.M. when the plaintiff was injured. Thus, the stevedore had constructive notice of the dangerous condition and its failure to correct it or have it corrected was negligence and a breach of its warranty of workmanlike service in that liability of the shipowner was a reasonably foreseeable consequence. See Smith v. Jugosalvenska Linijska Plovidea, 4 Cir., 1960, 278 F.2d 176; Berti v. Compagnie de Navigation Cyprien Fabre, 2 Cir., 1954, 213 F.2d 397; United States v. Arrow Stevedoring Co., 9 Cir., 1949, 175 F.2d 329.

Does the shipowner's own negligence foreclose it from indemnity?

■ The shipowner's right to indemnity flows from a breach of the stevedore's contractual duty. As such, negligence on the part of the shipowner cannot have the usual effect that contributory negligence has in a suit based on the breach of a non-consensual duty. As the Supreme Court said in Ryan:

"Whatever may have been the respective obligations of the stevedoring contractor and of the shipowner to the injured longshoreman * * * it is clear that, as between them-

selves, the contractor, as the warrantor of its own services, cannot use the shipowner's failure to discover and correct the contractor's own breach of warranty as a defense."

76 S.Ct. at page 238. Nor are concepts of active-passive negligence or primary-secondary fault helpful. See Weyerhaeuser S: S. Co. v. Nacirema Operating Co., supra. However, the Supreme Court has indicated that certain activity on the part of the shipowner may be such as to excuse performance on the part of the stevedore. It remains to examine the decisions to determine where the line has been drawn in order to see whether the shipowner's conduct here, in failing to provide a pin, will excuse the stevedore from its promise to indemnify the shipowner.

■ No case has been found where the shipowner has been denied indemnity because its own conduct was so gross as to excuse performance by the stevedore. Indemnity has of course been denied because the stevedore has not breached its warranty. The facts in the following cases suggest that the negligence of the shipowner in the instant case is well within permissible conduct so far as the right to indemnity is concerned.

In Ryan a longshoreman was injured when a roll of pulpboard he was helping to unload broke loose because it had been insufficiently secured when stowed. The trial court found both the shipowner and the stevedore negligent in the manner in which the cargo was loaded and secured. "The trial judge found * * * that the ship's officer present at the stowage 'did not properly perform his admitted duty to supervise the safe and careful loading of the vessel', although he had 'authority to remedy the condition or

---

5. This duty finds some support in the contract itself which contemplates "lost time" due to temporary suspensions or interruptions not due to the failure of the stevedore's own equipment. A complementary promise on the part of the shipowner to co-operate with the stevedore in keeping interruptions to a mini-

mum has also been suggested. See Hugev v. Dampskisaktieselskabet International, D.C.S.D.Cal.1959, 170 F.Supp. 601, 611, affirmed per curiam sub nom. Metropolitan Stevedore Co. v. Dampskisaktieselskabet International, 9 Cir., 274 F.2d 875, certiorari denied 1960, 363 U. S. 803, 80 S.Ct. 1237, 4 L.Ed.2d 1147.

halt the work'." 76 S.Ct. at page 240 (dissenting opinion of Black, J., quoting from Palazzolo v. Pan Atlantic S. S. Corp., D.C., 111 F.Supp. 505, 507).

In Weyerhaeuser a longshoreman was injured when a board from a temporary winch shelter fell on him. The shelter had been erected by an employee of the stevedore in New York but not dismantled before the ship sailed·to Boston where the injury occurred. The jury's verdict for the plaintiff established the shipowner's negligence but the general verdict was necessarily ambiguous and the specification of negligence was in doubt. In sending the case back for a more specific finding the Court said:

> "While the jury found [shipowner] 'guilty of some act of negligence,' that ultimate finding might have been predicated, inter alia, on the failure of [shipowner] to remove the shelter when the ship left New York, or a failure to correct or warn [stevedore] of a latent dangerous condition known to [shipowner] when [stevedore] began the Boston unloading. Likewise, the finding might have been predicated on a failure of [shipowner] during the five days in Boston to inspect the shelter, detect and correct the unsafe condition. Although any of these possibilities could provide the [longshoreman] a basis of recovery, at least the latter would not, under Ryan, prevent recovery by [shipowner] in the third-party action." 78 S.Ct. at page 441.

In Crumady a longshoreman was injured when a topping-lift parted, causing the boom it supported to fall. The wire rope that constituted the topping-lift was rated at three tons, which was also the safe working load of the boom. The winch around which the rope was wound had a cut-off device or circuit breaker set to shut off current when the stress on the wire rope was six tons—twice the safe working load of the hoisting device which the winch served. The circuit breaker had been "adjusted by those acting for the vessel owner." [6] The trial court concluded that the setting of the winch cut-off device at twice the safe-load rating rendered the vessel unseaworthy. But the court also found that the unskillful handling of the winch and the boom by the stevedore's employees—conduct which was both negligence and a breach of the stevedore's warranty of workmanlike service—created the stress in excess of six tons and thereby "brought into play" the unseaworthiness of the vessel. The trial court awarded the shipowner indemnity from the stevedore on the theory that the shipowner was the third-party beneficiary of the stevedore's warranty. This decision was subsequently affirmed by The Supreme Court.

In American Export Lines, Inc. v. Revel, 4 Cir., 1959, 266 F.2d 82, a longshoreman was injured when a drum that was being loaded aboard the ship fell. A defective winch being operated by other longshoreman was the cause of the injury. The winch was ship's equipment. In fact it had been rigged by the ship's crew. The shipowner was negligent in failing to inspect the winch. The stevedore knew of the defect but continued to load the ship—conduct which breached its warranty. The shipowner was allowed indemnity.

In Calmar S. S. Corp. v. Nacirema Operating Co., 4 Cir., 266 F.2d 79, certiorari denied 361 U.S. 816, 80 S.Ct. 56, 4 L.Ed. 2d 62, a longshoreman was injured while working in the hold when one of his fel-

---

6. 79 S.Ct. at page 448. The quoted language implies that the device was set by the ship's crew and at least one court in discussing the facts of Crumady so states. See Calmar Steamship Corp. v. Nacirema Operating Co., 4 Cir., 266 F.2d 79, at page 80. The trial court in Crumady in a long opinion in which very close attention is paid to facts nowhere says that the device had been set by the crew. Indeed, it is possible to infer that the device was set by the original manufacturer when it was installed in June, 1952, and that the crew made no change in the setting of the device between that date and January 2, 1954, the date of the accident, although a ship's surveyor had inspected the gear in the interim.

low employees threw a cargo light into the hold. The light had not been properly "seized", from which the jury concluded that the ship was unseaworthy and the shipowner negligent. The jury also found the stevedore negligent in using the light in its defective condition and in the manner in which the light was thrown into the hold. By contract the shipowner was obligated to supply cargo lights which the trial court interpreted to mean reasonably safe lights and on the finding of the jury concluded that the shipowner had breached its contract with the stevedore and therefore the court denied indemnity to the shipowner although the stevedore was found to have also breached its warranty of workmanlike service. The Court of Appeals reversed and entered judgment for the shipowner. In summation that court said:

> "In determining whether the actions of Calmar were such as to bar recovery, we must necessarily compare them to those of the owner in Crumady. Here, the ship did not inspect the light and did not provide seizing. In Crumady the ship's crew supplied a cut-off device which they had set at twice the rated limit of the rigging. Certainly supplying the defective cut-off device was no less a contractual violation there than the supplying of the unseized cargo light here. If the former did not preclude recovery, then, under the principle announced in Crumady, we think the latter should not." 266 F.2d at page 81.

It has been a source of concern that the obligations of the shipowner and the stevedore are not mutually identical. This lack of symmetry has been often commented on, but I think no one has put the matter in better perspective than Judge Mathes in Hugev v. Dampskisaktieselskabet International, D.C.S.D.Cal. 1959, 170 F.Supp. 601. Judge Mathes said:

> "In almost every instance, when a stevedoring contractor commences the work of loading or unloading a seagoing vessel, the ship has arrived in port only a few hours before. She may have been at sea for weeks or months. Almost always, she has ridden some heavy seas. Often she may have rolled and pitched through mountainous seas for days, taken thousands of tons of water over her decks, sailed through freezing and tropical weather, and been beaten by 100 mile an hour gales. Almost surely she will have been serviced by stevedores of varying degrees of competency in other parts throughout the world.
>
> "Being a mass of plates, pipes, wires, beams and various mechanisms, each to some degree vulnerable to the elements, it would be much too much to expect a cargo vessel to arrive in port with all equipment, appliances and facilities in a fully seaworthy condition. Especially is this true with respect to the hatches, booms and winches, which are relatively more likely to be in disorder because of the elements, and the abuse and misuse of men as well. It is reasonable to expect, then, that many things may be wrong with a freighter and her equipment when she arrives in port; that she may well be a place of danger even as she docks. And all of these lurking dangers may be due entirely to the hazards of the ship's service.
>
> "The stevedoring contractor knows that the ship has been at sea; that she may be in many respects dangerous to the life and limb of an unskilled person; that if a condition is found which is unsafe for the professional longshoreman, as a rule the contractor can remedy it at the expense of the shipowner; that if the stevedoring operations are thereby delayed, the shipowner normally must pay for standby time.
>
> "Stevedoring contractors hold themselves out as being trained and equipped to cope with these conditions and these dangers. To this

end, the stevedoring contractor is usually given full use and charge of the ship's loading and unloading equipment and appliances and the cargo hatches and holds. So it is that the stevedoring contractor cannot reasonably expect, and does not expect, to board a vessel which in all respects, as to equipment and appliances as well as hull, is in a seaworthy condition, or even in a reasonably safe condition  *  *  *." 170 F.Supp. at pages 609–610.

### Do the express provisions of the stevedoring contract negative these implied warranties?

What has been said up to now assumed that the provisions of the stevedoring contract were silent on the subject of indemnity. But that is not the case here. Therefore, the conclusion reached that the shipowner would be entitled to indemnity upon theories of implied-in-fact indemnity must be tested by the particular provisions of the applicable agreement. The stevedore was hired by the consignee of the cargo. The contract between the stevedore and the consignee contained not only the general language from which courts have implied the warranty of workmanlike service—"The Contractor will provide all necessary labor and services to discharge  *  *  *  paper from ships  *  *  *  in a prompt and efficient manner"—but also a specific indemnity provision:

> "The Contractor agrees to indemnify and hold harmless The News and its subsidiary and affiliated companies as well as any other persons and companies for which The News may be handling paper against any and all personal injury or property damage claims or suits, and any loss, cost or damage in connection therewith which may be asserted or maintained by any person  *  *  *  which is not a party to this agreement and which may arise in connection with or result from the operations to be carried on by the Contractor under this agreement."

Under the reasoning of Crumady and Waterman, the shipowner is the third-party beneficiary of an implied warranty of workmanlike service and any promise to indemnify that accompanied that warranty. But the shipowner here, after setting up a claim in its original third-party complaint that it is a third-party beneficiary of the express promise to indemnify just quoted, now chooses to rely entirely on an implied promise to indemnify flowing from the undertaking of the stevedore to do its work "in a prompt and efficient manner." The stevedore argues that the entire intention of the parties is contained in the express indemnity provision and, expressio unius est exclusio alterius, no other indemnity provision may be implied.

Assuming that the shipowner is the third-party beneficiary of that express promise to indemnify as it would be of any implied promise, it is clear that the shipowner has raised certain theoretical problems by its refusal to rely on that express right. Therefore, before going too far afield it will do well to examine the assumption just made, viz. that the shipowner is a third-party beneficiary of the express promise. While the shipowner is not specified as a beneficiary of the stevedore's promise to indemnify, two other classes are: (1) affiliates and subsidiaries of the consignee-promisee; (2) persons for whom the consignee is handling the cargo of paper. It would seem, therefore—expressio unius est exclusio alterius—that the parties to the contract did not intend to make the shipowner a beneficiary of this specific indemnity clause. The shipowner arguably was not meant to be the beneficiary of this clause of the contract because it was already the beneficiary of the implied-in-fact promise of the stevedore to indemnify for breach of its implied-in-fact warranty to do its work "in a prompt and efficient manner." Cf. Royal Mail Lines, Ltd. v. Peck, 9 Cir., 1959, 269 F.2d 857. In Oleszuk v. Calmar S. S. Corp., D.C.D. Md.1958, 164 F.Supp. 628, reversed on other grounds sub nom. Calmar S. S.

Corp. v. Nacirema Operating Co., 4 Cir., 1959, 266 F.2d 79, the contract between the shipowner and the stevedore provided: "The [stevedore] will be responsible for loss or damage to the ship, its equipment and the cargo, through or as a result of negligence." 164 F.Supp. at page 632. A longshoreman had been injured because of the combined negligence of the shipowner and the stevedore. On the shipowner's claim for indemnity the stevedore made an "expressio unius" argument i. e. having agreed to indemnify the shipowner for certain losses, no further agreement to indemnify the shipowner could be implied. The trial court rejected the argument concluding "from an examination of the entire contract * . * * that the quoted clause was not intended to eliminate the implied obligation of the contractor to indemnify the operator against 'foreseeable damages resulting to the shipowner * * * from the contractor's improper performance'." Id., at page 633. This issue was not discussed by the Court of Appeals.

The stevedore argues here that to look anywhere else than the express indemnity provision for a promise to indemnify would alter the intention of the parties and cast a burden different in scope upon the stevedore than that bargained for. The theory of the Ryan case is that the liability of the stevedore is a consensual act—a contract implied-in-fact—rather than an obligation imposed by law. It would follow that this obligation could be altered by agreement. Ryan, of course, involved a situation where the stevedore was hired by the shipowner and therefore there was privity between them. In our case the stevedore is removed from the shipowner by a time charterer and a consignee. It is therefore not certain how the contract between the consignee and the stevedore could limit the rights that the shipowner has under the Ryan case as interpreted in Crumady and Waterman.

■ But that difficulty is not presented here because the contract does not seek to limit those rights. The stevedore expressly convenanted with the consignee to do its work "in a prompt and efficient manner." The shipowner is a third-party beneficiary of that promise. The stevedore also promised to indemnify the consignee and two other named classes "against any and all personal injury or property damage claims or suits, and any loss, cost or damage * * * which may arise in connection with * * * the operations to be carried on by the Contractor." Although this express promise to indemnify does not expressly cover a loss caused in part by the negligence of the consignee the promise to do so has been implied where the only liability of the promisee (the consignee) in the first instance could be based on negligence. See Rice v. Pennsylvania R. R. Co., 2 Cir., 1953, 202 F.2d 861; A/S J. Ludwig Mowinckels Rederi v. Commercial Stevedoring Co., 2 Cir., 1958, 256 F. 2d 227; Porello v. United States, D.C. S.D.N.Y.1950, 94 F.Supp. 952. This is true even though as a general rule indemnity provisions will not be construed to cover the negligence of the indemnitee. See American Stevedores, Inc. v. Porello, 1947, 330 U.S. 446, 67 S.Ct. 847, 91 L.Ed. 1011; Rice v. Pennsylvania R. R. Co., supra. We have already seen that the shipowner's negligence does not defeat its right to indemnity under an implied contract. Thus it would seem that there is no inconsistency between the right to indemnity that is an adjunct of the implied warranty of workmanlike service and the express warranty contained in the contract in this case. Therefore no inference can be drawn that the stevedore bargained for a limitation of its liability.

Does indemnity include attorneys' fees?

■ As part of its claim the shipowner seeks a reimbursement for the fees expended in the defense of the longshoreman's action. The parties have stipulated that the reasonable value of these services is $3,000 for attorneys and an additional $1,500 for expenses and disbursements. The authorities now recognize that the indemnitee has a right

to these fees. See A/S J. Ludwig Mo-winckels Rederi v. Commercial Stevedoring Co., 2 Cir., 1958, 256 F.2d 227, 232; Shannon v. United States, 2 Cir., 1956, 235 F.2d 457, 459; Gonzales v. Pennsylvania R. R. Co., D.C.S.D.N.Y.1960, 183 F. Supp. 779, 781; Holley v. The Manfred Stansfield, D.C.E.D.Va.1960, 186 F.Supp. 805, 809; Lilleberg v. Pacific Far East Line, Inc., D.C.N.D.Cal.1958, 167 F.Supp. 3, 5. In Holley the court said: "It is now fairly well settled that an indemnitee may recover attorney's fees and expenses from an indemnitor under either an express or implied contract of indemnity." 186 F.Supp. at page 811.

### Shipowner v. Charterer

Having determined that the shipowner is entitled to indemnity from the stevedore we return to the question put to one side earlier: Is the shipowner entitled to indemnity from the charterer? The shipowner claims that the charterer's obligation under the charter party to load and unload the vessel included the warranty that it would do the job safely and indemnify the shipowner for any loss occasioned by the breach. The charterer denies that any such warranty is to be implied. Rather, it asserts, that under the charter the shipowner warranted to it that the ship was fit and undertook to maintain the ship and its equipment in an efficient state. In effect, the charterer argues that the failure of the shipowner to provide a safety pin for the winch was a breach of the shipowner's covenant to maintain and that the shipowner is under a duty to indemnify the charterer should it suffer any loss due to the shipowner's breach.

The shipowner's chief support for its position is Revel v. American Export Lines, Inc., D.C.E.D.Va.1958, 162 F. Supp. 279, 286, affirmed 4 Cir., 1959, 266 F.2d 82. In that case the shipowner was allowed indemnity from the charterer under a provision wherein the charterer agreed to arrange for loading and discharge of cargo and covenanted that "the cargo shall be efficiently loaded in the vessel." That is broader than the char-ter covenant in the instant case, which is only that the charterer will bear the expense of loading and unloading, not that it will do the job "efficiently." Furthermore, the authority of that case is undermined in two important respects. First, the charterer in that case conceded that it had a duty to reimburse the shipowner for loss occasioned by inexpert stevedoring service. And second, Revel was decided before Crumady established that the shipowner is the third-party beneficiary of the stevedore's warranties to the charterer.

The shipowner seeks to apply to a shipowner-charterer relationship the reasoning of Ryan and its progeny, which have found a warranty of workmanlike service in the relationship of shipowner-stevedore. The stevedore's warranty arises because it holds itself out to do a job; that it is proficient in its work which, being done aboard a ship, is necessarily fraught with danger and therefore requires a degree of expertise. The charterer, on the other hand, makes no representation that it is either an expert seaman or an expert stevedore. Workmanlike service and reasonable safety on the part of the charterer are not the "essence" of the charter as they are of a stevedoring contract.

A similar conclusion was reached in Matson Navigation Co. v. United States, D.C.N.D.Cal.1959, 173 F.Supp. 562. There the shipowner sought indemnity from the owner of the cargo. In that respect the cases are distinguishable because here the shipowner seeks to hold the time charterer. But the court's analysis is pertinent:

"Ryan does not warrant a holding here that there was a contractual obligation on the part of the United States to indemnify Matson for any loss to Matson resulting from improper handling by the United States of its own cargo. In Ryan, the Supreme Court stated that the stevedoring company's obligation to handle cargo properly and safely was a warranty of workmanlike service

comparable to a manufacturer's warranty of the soundness of its product. In the present case, the United States did not offer its services to Matson as a professional stevedore. It merely contracted to assume the responsibility for the removal of its own cargo from Matson's vessel. This is too flimsy a predicate for a warranty of professional competence from which could be implied a contractual obligation to indemnify Matson for any damages it might be required to pay another as a result of improper handling by the United States of its cargo." 173 F. Supp. at page 564.

▪▪▪▪▪▪ Of course, a charterer may agree to assume the duty to indemnify and no doubt, under appropriate circumstances, that obligation may be implied as a fact. The intent of the parties is, of course, controlling and perhaps the concession of the charterer in Revel meant nothing more than that. But I find nothing in this case to support the conclusion that the parties here intended such a result.[7] Nor do I find any policy of the law that would require such an agreement to be implied against the intention of the charterer. Furthermore, the jury has found the shipowner negligent and the general rule is that no indemnity provision will be implied to cover one's own negligence. See American Stevedores, Inc. v. Porello, supra.

### Stevedore v. Charterer

This lawsuit contemplated three possible stages. The first stage, longshoreman v. shipowner, ended with a verdict for the longshoreman. This opinion disposes of the second stage: shipowner v. charterer and stevedore. There remains the third stage: stevedore v. charterer. The cross-claim of the charterer against the stevedore has become academic in view of the fact that I have held that the charterer is not liable to the shipowner. And the stevedore's theory of indemnity from the charterer—the common law duty owed the secondary or passive tortfeasor by the primary or active tortfeasor—does not seem to accommodate the facts as found by the jury and the court.

In keeping with the sequence agreed upon, however, I will label this last conclusion "tentative" and schedule a date for a final hearing at which time any evidence bearing upon this cross-claim still outstanding may be offered and argument had.

This opinion constitutes the findings of fact and conclusions of law with reference to the claim of the third-party plaintiff against the third-party defendants. As to the cross-claim of Daniels and Kennedy against Illinois Atlantic these parties will confer with the court to set a date for a hearing. Settle an order, consistent with this opinion, on or before ten days from the date hereof.

---

7. The charterer's contention that it is merely a lessee of space aboard the vessel is borne out in the following provisions of the charter wherein the owner covenants: "hull, machinery and equipment in a thoroughly efficient state"; "vessel on her delivery to be * * * in every way fitted for the service"; "to maintain her class and keep the vessel in a thoroughly efficient state in hull, machinery and equipment for and during the service"; owners shall maintain the gear of the ship as fitted." Finally, "Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the navigation, insurance, crew, and all other matters, same as when trading on her own account." See also Gilmore & Black, Admiralty 170 (1957); Poor, Charter Parties § 7 (4th ed. 1954).