**John SALIH, Plaintiff,**

v.

**UNIVERSAL CARGO CARRIERS CORPORATION, Defendant.**

United States District Court
S. D. New York.
Oct. 10, 1956.

Walter J. Klein, New York City, for plaintiff. Xavier N. Sardaro, Brooklyn, N. Y., of counsel.

Nelson, Healy, Baillie & Burke, New York City, for defendant. Allan A. Baillie, New York City, of counsel.

HERLANDS, District Judge.

This action was tried by the Court without a jury pursuant to pre-trial stipulation of counsel.

The complaint asserted one cause of action, combining the usual allegations of a claim based upon the Jones Act, 46 U.S. C.A. § 688, with the usual allegations of a claim based upon unseaworthiness, both claims being predicated upon the same set of facts.

There is no cause of action or claim for maintenance and cure. It is undisputed that plaintiff has received all the maintenance to which he was entitled.

The gravamen of the complaint is that plaintiff, while employed by defendant as a member of the crew of the S.S. Catherine M. Goulandris, a vessel owned and operated by defendant, suffered serious and permanent personal injuries in the course of his employment aboard defendant's vessel; that, due solely to defendant's negligence and the unseaworthiness

of its vessel, plaintiff was caused to fall on or about October 5, 1953; and that defendant's negligence and the unseaworthiness of its vessel was the result of defendant's failure to keep and maintain the vessel and its equipment and appurtenances in a reasonable state of repair, and defendant's failure to provide plaintiff with a reasonably safe place in which to work.

Upon the trial (as in the pre-trial deposition and discovery proceedings), the issue narrowed down to an accident which plaintiff claims to have occurred on October 5, 1953, when he attempted to board the vessel by means of its gangway, and he then allegedly slipped and fell on the gangway, thereby injuring his right knee, causing the damages sued for. Admittedly, the gangway was the only means of egress from and ingress to the vessel at the time. There were no eyewitnesses to the alleged accident, other than plaintiff himself.

Plaintiff is a resident of the State of New York. He was born in Aden, Arabia, in about 1892. He came to the United States in 1911. He became an American citizen in 1935.

Defendant is a corporation transacting business in the Southern District of New York. On October 5, 1953, defendant owned, operated and controlled the S.S. Catherine M. Goulandris, a Liberty type vessel.

Plaintiff was in the employ of defendant, as fireman-watertender on said vessel, from September 14, 1953 to October 8, 1953. He had not signed articles on said vessel; he took the position as a standby job.

From September 14, 1953, and for a period of forty-five days thereafter, the vessel was moored to a dock, Pier 16, Staten Island, New York. This was a slip type of pier.

During the period while the vessel was moored to Pier 16, the sole means of ingress to and egress from the vessel was a gangway provided by defendant. The starboard side of the vessel was tied to the dock or pier. The gangway ran from midship on the boat deck leading aft. At all relevant times, the vessel was in idle status, being manned by a skeleton crew.

The gangway was attached to a swivel platform on the boat deck (not the main deck) of the vessel by means of pins going through interlocking eyes on the platform and on the gangway. At about six feet from the dock and of the gangway, the gangway was suspended by chain bridles from a lifeboat davit on the boat deck. The gangway had a wooden roller at the under side of the end resting on the dock.

The gangway was approximately three feet wide. Its walking surface consisted of raised, corrugated iron steps or cleats, having a rise of about three inches. These steps or cleats were located along the gangway at intervals spaced about one and one-half to two feet. There was a tight, rope handrail on each side of the gangway. These rope handrails ran through a slot in the supporting stanchions which were spaced at intervals of about three feet.

The gangway was virtually new. Its cleats or steps were not worn; they were in good condition.

Although the gangway used by the vessel in October 1953 was a regular, regulation gangway, it was not a standard two-sectional Liberty ship type of gangway usually attached to the main deck. It was a one-sectional gangway attached to the boat deck. For all that appears in the record, plaintiff did not attempt to obtain (either pre-trial or during the trial) a photograph of the gangway or any blueprint or design plan of the gangplank.

One of the major elements in plaintiff's argument on the evidence is that the angle of incline of the gangway must have been more than forty-five degrees— approximately sixty-eight to seventy-two degrees—as a matter of mathematical computation, based upon the defendant's answers to certain pre-trial interrogatories propounded by plaintiff, as well as the deposition of defendant's chief mate. The answers and testimony referred to

are those concerning the length of the gangway—given as approximately forty-five feet—and the height of the ship's end of the gangway from the dock level—given as approximately fifteen feet or twenty feet. The Court has carefully considered and evaluated the pertinent evidence and finds that those figures are only rough approximations.

Defendant's chief mate also testified that the angle of incline to the dock was never more than forty-five degrees, and that it was usually forty-five degrees, the latter figure also being a rough approximation.

The accident having occurred in October of 1953, and the interrogatories having been propounded in May of 1956, defendant served its answers to the interrogatories on June 19, 1956, almost three years after the event. It would appear that defendant's only information with regard to the height of the ship's end of the gangway above the dock level was that contained in the pre-trial deposition of the chief mate, which deposition likewise had been taken in 1956 (on March 9).

The height of the ship's end of the gangway above dock level was not information that would, in the regular course of the vessel's business, be entered in any of its logs. Furthermore, it would be a constantly fluctuating figure due to the action of the tides and the surging movement of the harbor waters in the slip pier. (Plaintiff did not undertake to introduce into evidence readily available, precise information as to the state of the tide on the day and at the time in question.)

■ Evidence concerning the length of the gangway, the height of the ship-end of the gangway above dock level, and the angle of incline of the gangway relative to the dock, consisted of rough approximations. The Court finds that the angle of incline of the gangway relative to the dock was approximately forty-five degrees and not more.

At all relevant times, the end of the gangplank was on the dock. The chief mate, who rigged the gangway with the crew, regularly and properly watched and checked the gangway, as part of his routine duties, in order to see to it that the gangway rested on the dock and that the length of the chain bridles was adjusted (by lessening or tightening the slack), from time to time, to accommodate the gangway to the tide, which rose and fell two to three feet. No complaints were ever received with respect to the gangway. The gangway was not re-rigged or rearranged.

The maintenance of the chain bridles connected to the gangway was reasonably necessary and appropriate.

There is no significantly probative evidence of a credible character that adjustments for tide could have been made effectively by the use of the wooden roller on the under side of the dock end of the gangway without the use of the chain bridles.

There is no significantly probative evidence of a credible character that the rope handrails were improperly slack at any of the times material to the issues in this case or that the dock end of the gangway was raised above the level of the dock at any such material times.

The Court's conclusion is that, at all of the material times, defendant properly set up, adjusted and maintained a safe and an adequate gangway and appurtenances thereto; that the gangway was reasonably fit to permit plaintiff to leave and board the vessel with reasonable safety; and that the vessel was seaworthy.

There are specific features in the evidence which, in the Court's opinion, demonstrate that plaintiff's trial testimony as to when and how the accident occurred is incredible. The Court will first consider the position taken by plaintiff with reference to defendant's Exhibit "A," a statement dated July 28, 1954, given by plaintiff to defendant's claims agent. This exhibit states:

"On October 3, 1953 while proceeding up the gangway of the S.S. Catherine M. Goulandris I missed a step and twisted my right knee.

"The gangway was in good condition and clean. Upon boarding the vessel I proceeded to the galley and ate my lunch and reported to work. Five days later my knee started to pain me and I reported to the Master for a hospital slip.

"On October 8, 1953, I entered the U. S. Public Health Service Hospital, Staten Island, New York."

This statement fixes October 3, 1953 as the date of the accident, whereas in his trial testimony plaintiff claimed that the accident took place on October 5, 1953. October 3, 1953 is also the date of the alleged accident, according to the narrative summary clinical record of the Marine Hospital, which record plaintiff introduced into evidence as Exhibit "3."

The version of how plaintiff became injured, as set forth in his statement of July 28, 1954, was, of course, inconsistent with the essential allegations necessary to be proved by plaintiff upon the trial in order to recover. Moreover, the assertions contained in the statement of July 28, 1954, were inconsistent with the testimony given by plaintiff at the trial.

When confronted with his statement (Exhibit "A"), plaintiff attempted to extricate himself from the contradictions by charging that defendant's claims agent had tricked him into signing the statement; that he had been led to believe that the statement was in fact a receipt for his maintenance check; that he had not read the statement before he signed it, nor had the statement been read to him before he signed it. He admitted that the signature on the statement was his.

Plaintiff's position is belied by the convincing and credible testimony of Vincent J. McNerney, defendant's claims agent, a young man who impressed the Court with his truthfulness. McNerney testified that the statement had been read by plaintiff and also read to plaintiff before plaintiff signed it. Moreover, the suggestion of overreaching on defendant's part—that plaintiff signed the statement in the induced belief that it

was a receipt—is rebutted by the fact that plaintiff signed a receipt dated July 29, 1954 for $112 covering plaintiff's maintenance for the period July 14 to July 27, 1954, as appears from defendant's Exhibit "D."

The Court, having closely observed plaintiff while he testified throughout the trial, is of the opinion that plaintiff, who has been sailing the seas for forty-five years, working mostly with American crews, is an experienced and knowledgeable individual, who can understand, read, and write English to some extent, but who tried to palm himself off at the trial as stupid, ignorant, and illiterate.

Another example of plaintiff's tactic of accusing others in order to extricate himself from prior inconsistent statements, is the following: at the trial, plaintiff testified that after the accident, which he said took place on October 5, 1953, at or about 3 or 3:30 P.M., he went to his room, dressed, and went on watch —which was his regular assignment— working from 4 P.M. that day (October 5) to midnight. He further testified that the pain which he suffered at the time of the accident worsened, but that he returned the next day (October 6) to his regular assignment, working from 4 P.M. to midnight; that he slept that night, as he did the night before; and, although he says his leg swelled around the knee, he returned to work on October 7 at 4 P.M., working to 10 P.M., at which time he told the captain of the accident which had occurred on October 5. He reiterated his trial testimony that he had told the captain of the accident.

Plaintiff was then confronted with his examination before trial. In that pretrial examination (held on January 21, 1955), plaintiff flatly admitted that he had *not* told the captain of his injury (Examination Before Trial, s. m. pp. 21, 23), although the captain (on October 7, 1953, at 10 P.M.) had asked him, "What's the matter?" when plaintiff told him he would not work because his leg was swollen (s.m.p. 9).

Plaintiff thereupon charged that the shorthand reporter, who had stenographi-

cally taken the notes of his examination before trial, had erroneously reported or transcribed his pre-trial testimony.

The pre-trial testimony contained a stipulation waiving certification and signature by plaintiff. Plaintiff's attorney had a copy of the transcript before the trial commenced; but no apparent effort had been made by plaintiff or plaintiff's attorney to make any corrections in the transcript.

Defendant called to the stand Miss Emily C. Thompson, the shorthand reporter. She impressed the Court as a credible witness and as an expert shorthand reporter. She has worked as a shorthand reporter for twenty-five years, specializing in the reporting of maritime cases; she has taken thousands of pre-trial examinations. She produced and read from her original stenographic notes. This most persuasively established the accuracy of the transcript of the plaintiff's examination before trial. Plaintiff's implications in regard to Miss Thompson were unfair and unfounded.

It is undisputed that plaintiff worked on October 5 and 6 for the full eight hours of his watch, and for six hours of his watch on October 7. The Court is of the opinion that an accident did happen, but that it happened on October 3; and that, in view of the undisputed fact that plaintiff did not request and obtain a Master's Certificate until October 7 to go to the Marine Hospital for treatment, plaintiff undertook in his trial testimony to narrow the interval of time between the date of the accident and October 7, by moving up the date of the accident to October 5.

Plaintiff again demonstrated his testimonial unreliability when he testified repeatedly that the gangway was affixed to the main deck. The convincing testimony is that the gangway was affixed to the boat deck. Plaintiff's unreliable observation or memory is also illustrated by the fact that he does not remember other details about the gangway.

The Court has concluded that plaintiff is not a credible witness.

The Court does not regard as significantly probative of any of the essential facts in issue, the testimony given by the expert Master Mariner called by plaintiff. His testimony was unsatisfactory. Thus, with respect to his testimony that the tide might be from four to seven feet, that statement was made on the basis of "offhand remembrance," and was otherwise materially qualified by the witness' references to the season of the year and the particular kind of wind blowing. The force of his entire testimony was dissipated by the more convincing testimony of defendant's expert master mariner, Captain Syre, who has had more recent and closer contact with Liberty ships than plaintiff's expert.

The Court has concluded: that, on October 3, 1953, while going up the gangway, plaintiff missed a step and twisted his right knee, thereby injuring the knee; that the gangway at the time of the accident was properly rigged and in good order and condition; that the bottom of the gangway was not above the dock at the time of the accident; that the accident was not caused by any negligence on defendant's part nor by unseaworthiness of defendant's vessel with respect to her gangway or otherwise.

The Court has jurisdiction of the parties and of the subject-matter of the action.

In view of the Court's findings and conclusions that plaintiff has failed to establish that his accident and injury were caused by any negligence or unseaworthiness on the part of defendant, the Court does not reach the issue of the nature and extent of the injury and the resultant damages. It is, therefore, unnecessary to discuss the medical testimony or the evidence of plaintiff's loss of earnings and earning power.

Defendant is entitled to a judgment dismissing the complaint on the merits.

The foregoing shall constitute the Court's findings of fact and conclusions of law, Federal Rules of Civil Practice, rules 41(b) and 52(a), 28 U.S.C.A.

Within five days, on notice, such additional findings or conclusions as may be considered necessary to support the holdings herein may be proposed. The proposed judgment is to be submitted on notice.