Victor **NIKIFOROW**
v.
John F. **RITTENHOUSE.**
Civ. A. No. 40320.

United States District Court,
E. D. Pennsylvania.

Nov. 11, 1970.

Dorfman, Pechner, Sacks & Dorfman, Sidney J. Smolinsky, Philadelphia, Pa., for Victor Nikiforow.

Clark, Ladner, Fortenbaugh & Young, John A. McMenamin, Philadelphia, Pa., for John F. Rittenhouse.

Louis C. Bechtle, U. S. Atty., Warren D. Mulloy, Asst. U. S. Atty., Philadelphia, Pa., for United States.

## OPINION

KRAFT, District Judge.

In this maritime action for personal injuries, plaintiff, a member of the United States Coast Guard, after trial to a jury, recovered a verdict and judgment of $60,000 [1] against the defendant, Rittenhouse.

On November 13, 1969, the jury found, in answer to specific interrogatories, that the defendant's vessel was seaworthy; the defendant was negligent and the plaintiff was not guilty of contributory negligence.

Subsequent to the entry of judgment, the United States sought leave to intervene under the Medical Care Recovery

---

1. This judgment, plus costs of $426.86, has been satisfied by the defendant, Rittenhouse.

Act, 42 U.S.C.A. § 2651[2] in order to claim medical expenses of $5,795.60, which it had incurred in providing medical treatment for the plaintiff. Intervention was allowed under a stipulation of all parties, including the United States, and approved by the Court, that the original defendant would have the same right to plead and assert any right[3] he might have had, had the United States intervened prior to trial of the matter.

In his answer to the government's complaint, defendant filed a counterclaim against the United States seeking indemnity. Thereupon, the United States filed a motion to dismiss the counterclaim upon the sole ground that "such counterclaims are barred by the decision of the Honorable John W. Lord, Jr., in the captioned action, dated November 21, 1967."[4]

This motion was taken under advisement by the Court, and counsel agreed to rely upon the record of the plaintiff's trial, as supplemented by additional testimony, offered by the defendant, to enable the Court to adjudicate the respective claims of the government and the counterclaim of defendant, Rittenhouse.

In deciding the government's motion, the threshold question is whether the earlier decision of Chief Judge Lord bars the defendant's counterclaim as the "law of the case." At the time of Chief Judge Lord's decision the posture of the case was that the defendant, Rittenhouse, sought leave to join the United States as a third-party defendant. In denying such joinder, Chief Judge Lord held 277 F.Supp. at p. 613:

"As the defendant has candidly disclosed to the court, plaintiff cannot directly sue the United States since he is a member of the armed services. 50 U.S.C.A. § 551(2), Feres v. United States, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1951). Under such circumstances, the United States is not liable for contribution or indemnity

2. "§ 2651. Recovery by United States— Conditions; exceptions; persons liable amount of recovery; subrogation; assignment

(a) In any case in which the United States is authorized or required by law to furnish hospital, medical, surgical, or dental care and treatment (including prostheses and medical appliances) to a person who is injured or suffers a disease, after the effective date of this Act, *under circumstances creating a tort liability upon some third person (other than or in addition to the United States* and except employers of seamen treated under the provisions of section 249 of this title) to pay damages therefor, the United States shall have a right to recover from said third person the reasonable value of the care and treatment so furnished or to be furnished and shall, as *to this right be subrogated to any right or claim that the injured or diseased person, his guardian, personal representative, estate, dependents, or survivors has against such third person to the extent of the reasonable value of the care and treatment so furnished or to be furnished.* The head of the department or agency of the United States furnishing such care or treatment may also require the injured or diseased person, his guardian, personal representative, estate, dependents, or survivors, as appropriate, to assign his claim or cause of action against the third person to the extent of that right or claim. (emphasis ours).

Enforcement procedure; intervention; joinder of parties; State or Federal court proceedings

(b) The United States may, to enforce such right, (1) intervene or join in any action or proceeding brought by the injured or diseased person, his guardian, personal representative, estate, dependents, or survivors, against the third person who is liable for the injury or disease; or (2) if such action or proceeding *is not* commenced within six months after the first day in which care and treatment is furnished by the United States in connection with the injury or disease involved, institute and prosecute legal proceedings against the third person who is liable for the injury or disease, in a State or Federal court, either alone (in its own name or in the name of the injured person, his guardian, personal representative, estate, dependents, or survivors) or in conjunction with the injured or diseased person, his guardian, personal representative, *estate, dependents, or survivors.*"

3. Including indemnity and/or contribution.

4. D.C., 277 F.Supp. 608.

under the Federal Tort Claims Act. 28 U.S.C.A. § 1346(b); Drumgoole v. Virginia Electric & Power Co., 170 F. Supp. 824 (E.D.Va.1959); United Air Lines, Inc. v. Wiener, 335 F.2d 379 (9th Cir. 1964). *Absent any indication as to how the United States is amenable to suit under such circumstances,* defendant's motion to join the United States as a third-party defendant will be denied." (emphasis ours).

In the present posture of this litigation, the "circumstances" under which the United States is "amenable to suit", for indemnity, have now changed and matured. Unlike the pre-trial situation, when the United States was sought to be joined as an involuntary third-party defendant, the United States has now voluntarily intervened as a party plaintiff and has requested the interposition of this Court's equitable powers in aid of its claim to be reimbursed for the reasonable value of the care and treatment it furnished to the plaintiff. Such right may be barred by substantive defenses, such as contributory negligence.[5] Additionally, since the United States seeks indemnity, which is a remedy derived from equity, it must be prepared to do equity.[6] Accordingly, we conclude that, in the changed circumstances and under the parties' stipulation, the defendant may properly assert his counterclaim for indemnity against the United States and the motion to dismiss should be denied.

Turning our attention to the main issues in this case, we conclude, for reasons which will hereinafter more fully appear, that the United States is barred by its own negligence from recovering on its claim for medical expenses and that the defendant, Rittenhouse, is entitled to be indemnified for all sums which he has been compelled to incur in defense of this litigation.

The events giving rise to this litigation occurred on August 24, 1965, when the defendant, Rittenhouse, while operating his 1962 Sica Cabin Cruiser in the Great Egg Harbor Waterway, near Sea Isle City, New Jersey, ran aground on a sand bar in the vicinity of Marker Number 76. The grounding of the defendant's vessel occurred while the tide was on the ebb.

The plaintiff, Nikiforow, a seaman apprentice in the United States Coast Guard, was serving aboard the Coast Guard Cutter CG–30439, under the command of a coxswain, Buddy Short. The Coast Guard Cutter approached the defendant's vessel without request from Rittenhouse and offered to tow the defendant's vessel off the sand bar, in consideration of the execution by defendant of a release holding the United States harmless for damage to the defendant's vessel during the tow. Short directed Nikiforow to inspect the vessel only for the legally required safety equipment. Defendant executed the waiver, and, after assuring the coxswain that the sampson post on the bow deck was strong, Rittenhouse took aboard a two inch nylon line[7] from the Coast Guard Cutter, affixed the line to the post and threaded it through a small chock on the port bow of his vessel.

Prior to the start of the tow, neither the coxswain nor Nikiforow made any inspection to determine the degree of entrenchment in the sand or the depth of the water at the point of the grounding, nor did they make any inspection of the structure or the strength of the sampson post. In fact, plaintiff never received training or instructions as to the necessity for such preliminary inspections.

---

5. United States v. Greene, 266 F.Supp. 976, 978–979 (N.D.Ill.Ed.1967).

6. "He who seeks equity must do equity." Vol. 1 Bouvier Law Dictionary, p. 1062.

7. Six months previous to the date of the accident, the Coast Guard introduced nylon line into its towing operations in place of manilla rope and Coast Guard personnel had been instructed to be careful when using nylon line because it was still in the experimental stage and had great elasticity, giving rise to the danger of snapping back with great force.

Unknown to Rittenhouse, he was considered by the Coast Guard personnel to be in charge of the towing operation and to possess the power to stop it at any time. In point of actual fact, the coxswain was in charge of the cutter and did, in fact, exercise exclusive control over and direction of the towing operation. No inquiry was ever made of Rittenhouse by the Coast Guard personnel as to his competence and experience in towing operations. Since Rittenhouse had never been involved in a towing operation, he relied, quite reasonably, upon and deferred to the skill and competence of the Coast Guard personnel.

Before the tow began, Nikiforow returned to the cutter and positioned himself behind a wire-mesh safety screen, designed to protect the coxswain and himself from harm. As ultimately will be shown, the safety screen, which had a "give" of almost twelve inches, proved unsuitable in the circumstances for its intended purpose.

Coxswain Short commenced the towing operation and made at least three unsuccessful attempts to free the defendant's vessel from the sand bar. All of the attempts were made from the portside of defendant's craft, the final effort being made from an angle somewhat aft the port beam of the defendant's vessel. When the second attempt was undertaken, the coxswain increased the engine power to 600 r. p. m., which was sufficiently powerful to heel the defendant's vessel over to a 45 degree angle. On the third attempt, engine power was further increased to 1000 r. p. m. This surge caused the defendant's vessel to heel over to such an extent that a marked degree of tilt was created. This resulted from the position of the bow of defendant's vessel, high on the sand bar, and the increased force exerted by the engines of the cutter, which sat lower and lower in the water as the cutter, re-

strained by the tow line, increased its power. The foreseeable consequence was that the tow line on the sampson post pulled almost vertically, rather than horizontally. The pressure was different from and more than the post was designed to withstand. As a result, the lamination of the post parted around the lag bolt securing it to the keel, the deck ceased to provide the designed lateral support for the sampson post, causing it, literally, to be uprooted, and, because of the elasticity of the nylon line, to be propelled across the distance between the two vessels, striking the safety screen and severely injuring Nikiforow.

Under the evidence the jury found Rittenhouse negligent because he failed to advise the Coast Guard personnel that the chock on the port bow, through which the line had been run, had parted and because he failed to stop the towing operation when it should have been evident that the Coast Guard coxswain was reckless of the safety of the defendant's vessel and of the other persons involved in the attempted tow.

■■ While the negligence of Rittenhouse has been established by the verdict of the jury, that negligence was merely "passive" or "secondary" to the "active" or "primary" negligence of the United States. It is manifest from this record that Rittenhouse understandably and reasonably relied on the purported expertise and control exercised by the Coast Guard in the towing operation. The understanding of the Coast Guard personnel, not communicated to Rittenhouse, that he had either full control or the right to control the towing operation does not militate against the defendant's understanding.[8]

Having assumed full control of the towing operation, the Coast Guard was primarily negligent in failing to inspect the sand bar, the extent and degree of the grounding and in then initiating the

8. The record supports this conclusion since Nikiforow testified that in his experience as a seaman, involved in towing operations, he never recalled any pleasure boat owner taking command of the towing operation.

dangerous, and increasingly forceful broadside tow, when defendant's vessel was so deeply entrenched in the sand at ebb tide. By simply waiting for a turn of the tide, later in the day, the vessel would have floated off unaided, as it actually did. Moreover, when it became evident, by the marked tilt of the vessel, that the towing operation had become dangerous, the coxswain owed a duty to *all* concerned to cease further rescue efforts or at least to desist, to ascertain if a different and reasonably safe method could be devised. Additionally, the failure of the Coast Guard to train and instruct the plaintiff and the coxswain properly and adequately in safety and inspection procedures, prior to commencement of and during any towage, precipitated the injury which occurred to the plaintiff.[9]

 Alternatively, when the Coast Guard, without solicitation by the defendant, undertook to free the vessel from the sandy bottom, in return for the execution of a waiver of liability, an admiralty contract came into being. Under this contract the Coast Guard impliedly warranted that it would perform its service in a careful, safe and seamanlike manner. Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956). Having breached this implied warranty, which directly resulted in defendant's liability to the plaintiff, defendant is entitled to full indemnity from the United States. That indemnity includes the total amount of the judgment ($60,000) and costs ($426.86) as well as counsel fees of $18,423.48 and $750.00, which fees are fair and reasonable. A.C. Israel Commodity Co. v. American-West African Line Inc., 397 F.2d 170 (3 Cir. 1968) cert. denied 393 U.S. 978, 89 S.Ct. 446, 21 L.Ed.2d 439 (1968).

Accordingly, we enter the following

9. The proven inadequacy of the safety screen supplied by the Coast Guard also breached the duty of providing adequate

### ORDER

Now, this 11th day of November, 1970, it is ordered that:

1. the motion of the intervenor-plaintiff, United States, to dismiss the counterclaim of the defendant, Rittenhouse, be, and it is, denied;

2. in the action of the United States for payment of medical expenses, judgment be, and is now entered in favor of the defendant, Rittenhouse and against the intervenor-plaintiff, United States;

3. on the counterclaim of the defendant, Rittenhouse, for indemnity, judgment be, and is now entered in favor of the counterclaimant, Rittenhouse, against the intervenor-plaintiff, United States, in the total sum of $79,600.34;

4. the foregoing Opinion and Order constitute the Court's findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a).

safety devices owed to the plaintiff by the Coast Guard.