Mack G. **COGGINS**

v.

**JAMES W. ELWELL AND CO., INC.**

**TERRACE NAVIGATION CORP.**

v.

**UNITED STATES of America.**

Civ. A. No. 69–1011.

United States District Court,
E. D. Pennsylvania.

March 19, 1973.

John A. McMenamin, Clark, Ladner, Fortenbaugh & Young, Philadelphia,

Pa., for third party plaintiffs-defendants.

Anthony W. Gross, U. S. Dept. of Justice, Admiralty Section, Washington, D. C., for third party-defendant.

## OPINION

HIGGINBOTHAM, District Judge.

The above-captioned matter presently before the Court is an action in admiralty wherein the defendants have lodged a third-party complaint against the United States of America (hereinafter the "Government") seeking indemnity or contribution for a pre-trial settlement effected between the plaintiff, Mack G. Coggins, and the defendants, owners of the ship in question.

The recent pronouncement of the United States Supreme Court in Atlantic Coast Line R. R. Co. v. Erie-Lackawanna R. R. Co., 406 U.S. 340, 92 S.Ct. 1550, 32 L.Ed.2d 110 (1972) should, at least for the moment, dispel any reservations about the viability of the doctrine enunciated in Halcyon Lines v. Haenn Ship Ceiling and Refitting Corp., 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318 (1952). Notwithstanding the trenchant criticism of *Halcyon* and the ingenious attempts by shipowners to circumvent its impact, the Supreme Court in its per curiam opinion reaffirmed *Halcyon* as being the prevailing authority on the subject. Therefore, in view of this revitalization of *Halcyon*, which under federal maritime law precludes the right of contribution from joint tortfeasors in non-collision personal injury cases, the defendants' request for contribution is denied and the only other question presented before the Court for decision is the defendants' entitlement to indemnity. For reasons hereinafter appearing, the defendants' indemnity claim against the Government must also be dismissed.

On February 15, 1968, plaintiff Mack G. Coggins, an American merchant seaman, was employed as an able-bodied seaman aboard the SS Thunderbird, a vessel owned and operated by the defendants. On said date, the SS Thun-

derbird was berthed in navigable waters in the Port of Sunny Point, North Carolina, a facility operated by Military Ocean Terminals, a Government agency.

Due to the peculiar construction of the Sunny Point dock, the bulwarks of laden vessels were often at the level of the dock or even below it. Consequently, the laden vessel's regular accommodation gangway generally could not be utilized unless there was a very high tide. Normally, after a vessel is approximately two-thirds loaded, use of the ship's regular gangway must be discontinued in order to prevent the gangway from hitting the pier and thus being broken. At this stage of the loading when the ship's regular gangway must be heaved in, the Terminal operator, upon request, would supply a specially constructed, temporary gangway, which is known in the maritime world as a brow gangway or brow.

On the evening of February 15, 1968, a brow gangway was employed to provide access to the SS Thunderbird. Around 8:30 p. m. plaintiff Mack G. Coggins was descending the brow while in the process of helping to load vessel stores (wire, paint, food, etc.) preparatory to sailing the next morning. Coggins had been in the United States Navy for 21 years, having retired the previous June with the rank of Bosun's Mate First Class. While descending the brow during the course of this work, his left foot slipped, causing his body to twist, his leg hitting the banister supporting the handrail. The injuries sustained by Coggins from this fall precipitated the ensuing litigation against the defendants under the Jones Act, 46 U.S.C. § 688.

In the complaint filed by Coggins against the defendants, he demanded damages of $150,000, alleging negligence on the part of the defendants and unseaworthiness of the SS Thunderbird. The defendants impleaded the Government, contending among other things that the brow utilized here was supplied by the Government, that the brow was unsafe and unfit for the uses intended, and ac-

cordingly the Government was liable to them under a legal theory sounding either in indemnification (contract or tort) or contribution as a joint tortfeasor. Mounting a three-pronged defense, the Government asserted (1) the defendants by their depositions and evidence adduced at trial have not established beyond a preponderance of the evidence that the brow on which Coggins was injured was actually provided or constructed by the Government; (2) the ship became legally responsible for maintaining the brow in excellent physical condition once the ship acquired possession of the brow and began using it; and (3) the ship was actively negligent in allowing or requiring Coggins to use the brow when it became too steep and/or unsafe.

Alleging that the Government refused to participate in any settlement negotiations or contribute thereto, the defendants prior to trial settled directly with the plaintiff in the amount of $20,000, with an additional payment of $1,466.50 in satisfaction of contractual obligations to plaintiff for maintenance and cure and unearned wages accruing to him for the duration of the voyage during which he was disabled. Without here enumerating the details of Coggins' injuries and the medical treatment received, I have reviewed the relevant portions of the record and conclude that the settlement effectuated by the defendants was reasonable.

Subsequent to the foregoing settlement a non-jury trial was conducted to determine the respective liabilities of the defendants and the Government. Much of this opinion will be devoted to outlining the facts as they were reconstructed in the depositions and at the trial and thus hopefully clarifying and elucidating what actually transpired.

## I. THE PHYSICAL DISSIMILARITIES OF GOVERNMENT CONSTRUCTED BROWS.

The brow gangways which the Government made available to vessels requesting them were constructed at Sun-

ny Point by Army personnel. As disclosed at trial, not all the visiting vessels needed Army brows. Those ships which did borrow them would normally leave them on the pier when finished, or, as in a few instances, would sometimes even pull them aboard and carry them away. When the ship had departed the stevedore personnel under contract with the Army, Ryan Stevedore Company, would be responsible for removing the brow and placing it on the opposite side of the wharf where it would therefore not be available for immediate re-use by another ship. This procedure is consistent with the Army practice of not leaving or placing a brow in a position where it could be readily obtained by an incoming vessel. There was no central monitoring system however which would assure that brows were always removed immediately upon departure of a laden vessel.

When an Army brow was requested the standard Terminal procedure would require the Army carpenters to deliver the brow to a location on the berth which was on the opposite side of the pier at which the vessel was docked. Stevedore personnel would then transport it from that position on the wharf to the loading apron, where the requesting ship's crew would secure the brow to the ship; the Army never participated in installing any brow. The evidence establishes that the brow used by the SS Thunderbird on the evening of the accident was brought to the ship by the stevedore, Ryan Stevedore Company, and either the stevedore or the ship's crew affixed it to the ship. Rollers or skid boards for use underneath the brow were not furnished by the Army, but were made available to the ship by the stevedore.

An Army-constructed brow had a very short life. After being used by two or three ships, the brows were either discarded or repaired. All the discarded brows were burned and the lumber was never reused. New brows were built at the rate of three or four per week.

The wooden brows built by the Army were in 12, 14, and 16 foot lengths, with the majority being 14 feet in length. The 14-foot brow was specially designed for use by Victory-type vessels, such as the SS Thunderbird. These wooden brows had been used for at least two years before Coggins' accident by some 600 vessels without a reported accident.

The brow on which Coggins fell differed substantially from an Army-constructed brow. The Chief Mate of the SS Thunderbird, John C. Powers, testified the brow used that evening was 10 or 12 feet in length. Coggins, on the other hand, described the brow as being 18 feet in length. Were it an Army brow, it most assuredly would have been 14 feet long.

Further physical discrepancies exist between an Army brow and the accident brow. According to Coggins, the steps or cleats on the SS Thunderbird brow consisted of 1″ by 1″ lumber and were rounded by excessive wear. His testimony was partially corroborated by the Chief Mate, who concurred that the cleats were 1″ by 1″ lumber, although he could not recall the condition of the steps. In contrast, all the Army brows were equipped with cleats made of 2″ by 4″ lumber. What is even more extraordinary is that the Army lumber yard neither purchased or had in stock nor did it for any purpose use 1″ by 1″ lumber. Further, due to the short life of an Army brow, the 2″ by 4″ steps never received sufficient wear to become rounded.

There are additional physical dissimilarities. As described by Coggins, the floor of the brow utilized by the SS Thunderbird was built with 2″ by 4″ lumber. The Chief Mate recalled that either 1″ by 4″ or 2″ by 4″ lumber was used for the flooring. The Army, however, used 2″ by 10″ and 2″ by 12″ lumber for the flooring of its brows.

Finally, there is no evidence in the record which indicates that the Army was requested to furnish a brow for the SS Thunderbird or that the Army undertook to supply a brow for the ship. The only specific reference in the record

on this point discloses that the Chief Mate contacted an employee of Ryan Stevedore Company to provide a brow when its utilization became necessary.

■ The facts as presented by the Chief Mate and Coggins create a gap which the defendants cannot span to link the Government with liability. It is defendants' representative—the Chief Mate—whose precise testimony makes demonstrably clear that the brow on which the plaintiff was injured could not have been the brow which the Army made. The Government was not obligated to prove the source from whence defendants obtained this brow, but there is evidence in the record that it could have been a brow which had been brought to the port by some other ship and discarded there, or had been brought to the defendants by the stevedore company which had obtained the brow from a source other than the Army. The defendants had the burden of proving more than that they got the brow from the stevedore; they had to also prove that the brow in issue had been obtained by the stevedore from the Army, and they failed to prove the latter.

■ Based on the foregoing facts, the defendants have not met their burden of proof in stating a cause of action upon which relief can be granted. In view of the numerous physical discrepancies and the defendants' failure to demonstrate more clearly a factual causal nexus, the defendants, as third-party plaintiffs have not established beyond a preponderance of the evidence that the brow utilized by the SS Thunderbird on the night of the accident was an Army constructed brow or one which was supplied by the Army.

## II. THE USE AND MAINTENANCE OF THE SS THUNDERBIRD BROW.

I am making an alternative finding should an appellate court disagree with my ruling with respect to defendants' failure to meet their burden of proof. Assuming for the moment that an Army brow was employed, the record reveals that apparently the primary reason for Coggins' fall was not the condition of the brow but the manner in which it was put to use. Again, a detailed recitation of the facts will be helpful.

Irrespective of the origins of the accident brow, the Chief Mate testified that when delivered the brow was newly constructed, "firm," and "nailed together securely." The record is unclear as to the exact time the brow was secured to the SS Thunderbird; the best approximation by the Chief Mate fixed the time around two to two and one-half hours before the accident, or around 6:00 or 6:30 that evening.

Whenever a wooden gangway is utilized—be it a brow gangway or a ship's regular accommodation gangway—the rise and fall of the tide and the accompanying movement of the ship can cause the gangway to loosen and become less sturdy. At that stage, the Chief Mate, through members of his crew, is assigned the responsibility for resecuring the gangway by renailing the loosened portions of the brow.

At the Sunny Point Terminal, the Army employed the stevedore personnel to make any necessary repairs on an Army brow which deteriorated or became damaged while being utilized by a visiting ship. If the Army brow became damaged after the stevedore's normal working hour, the ship's crew would then effect the necessary repairs on the brow.

In addition to the stevedore personnel hired by the Terminal, the Terminal employed Army inspectors who, during their working hours from 8:00 a. m. to 5:00 p. m., would observe activities aboard the ships berthed at Sunny Point. Their duties entailed enforcing all applicable safety rules and regulations. If these inspectors observed a ship using an Army brow in an unsafe condition or in an unsafe manner, they would instruct either the stevedore's foreman or a ship's officer to correct the unsafe condition.

There are a number of practices which might be regarded as unsafe or dangerous, one of which would be the use of a wooden brow in a loosened or damaged condition. Another unsafe practice would be to use a brow at an angle in excess of 45 degrees.

On the evening of February 15, 1968, neither the Government inspectors nor the stevedore personnel were present or working at the time of the accident. As a rule the Government personnel and inspectors would terminate their day at 5:00 p. m. unless some members of the stevedore crew were still working on the ship. The Government surveillance personnel did not remain on duty after 5:00 p. m. if the ship's crew was merely loading ship stores.

There is a conflict in the testimony of Coggins and the Chief Mate as to the physical condition of the brow at the time of the accident. The Chief Mate asserted that when the brow needed to be repaired, any repairs would be immediately accomplished. Coggins, on the other hand, contends that both handrails were loose, that one of the braces was broken, and that the steps were rounded from excessive wear.

There is nonetheless agreement by both Coggins and the Chief Mate that at the time of the accident, the angle of incline of the brow was steep. Coggins stated that the brow was "steep" and rested at an angle of 45 degrees "or a little more." The Chief Mate testified that the brow's angle of incline was "between 50 and 60 degrees," that the brow was "very steep" and was "hazardous" to use. In fact, when the Chief Mate walked down the brow, he walked sideways, assigning as a reason that, "for safety, trying to walk down in a normal fashion was hazardous to say the least." (Powers, N.T. 21) There is no evidence that the ship's officers ever instructed the crew members to walk sideways when descending the brow.

It was not until the day after the accident that the Chief Mate was apprised by Coggins that he had fallen and injured himself the previous night. When later questioned as to whether Coggins gave an explanation as to how he sustained the injury, the Chief Mate responded: "Yes, that he [Coggins] slipped on the gangway when the tide was highwater stage and *the steepness of the gangway caused him to slip.*" (Emphasis added.) (Powers, N.T. 10–11.) A month later, Coggins expanded his remarks, asserting that the brow was too short and that it had some broken boards. In explaining the history of the ailments to the medical authorities, Coggins merely stated that he slipped on the brow and twisted his back. When this matter was in litigation, Coggins then began complaining about worn steps and loose handrails.

Captain Kenneth Mistry, the expert witness for the *defendants* at the trial, testified that he would not have permitted his men to use a brow at an unsafe angle, one which was 45 degrees or more. The following dialogue then occurred between Mr. John McMenamin, counsel for the defendants, and Captain Mistry:

"BY MR. McMENAMIN:

"Q Arising out of the last question, at a port like that with a ship fully laden, what choice would you have had as a chief mate to use a brow like that, to allow your men to work on a brow like that?

"A I would insist for a longer brow, the longer the brow the angle is better. Then you can overlook a few things like a worn-out step. You can also overlook the side handrails because they don't form an important part when the brow is long. The longer it is, the angle is less. It is more or less not exactly horizontal, but it is on a horizontal plane. People traversing that particular brow, their whole weight is resting on the brow and none of it is transferred into their hands and onto the handrails.

"Q And as a chief officer, what choice would you have had if all the shipyard workers had gone for the day at the time it was being used?

"A I personally discontinued—when I have experience with this I have discontinued such a brow gangway if it becomes so steep that it is not fit to be used, I have utilized a regular pilot's ladder over the side. If it is only 8, 10 feet above the water I utilized the regular pilot's ladder." (N.T. 41–42.)

Rather than discontinue using the brow, although it would necessarily have meant for the Chief Mate and his crew an unfortunate and unavoidable delay, the Chief Mate persisted in continuing the loading and requiring his men to use the brow which, according to the Chief Mate's own testimony, was "hazardous" to descend except by walking sideways.

There is evidence of record which establishes that the SS Thunderbird arguably could have substituted its own regular pilot's ladder for the wooden brow. At the time of the accident, the tide was high and, according to Coggins, the bulwark of the ship was approximately eight feet above the pier. Captain Mistry, the defendants' expert, recommended employing a ship's own pilot's ladder when there existed a clearance of eight or ten feet. Breaking out the vessel's regular gangway would have required the services of four crew members for 30 minutes.

 The defendants vigorously pressed before this Court the argument that under Ryan Stevedoring Co., Inc. v. Pan-Atlantic Steamship Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956) and its progeny the Government was contractually liable and obligated to indemnify the defendants for any monies expended and damages incurred by them due to the use of the allegedly defective brow purportedly constructed and provided by the Army. In Ryan, the Supreme Court announced that by reason of the expertise and competency of a professional stevedore, implicit in the agreement of the stevedore to perform all of the ship-owner's stevedoring operations is an implied warranty that said services would be discharged properly and safely. Even in the absence of an express agreement of indemnity, the stevedoring contractor will be obligated to reimburse the shipowner for any damages incurred by the latter due to the former's improper stowage of cargo. 350 U.S. at 132–135, 76 S.Ct. at 236–238.

 Notwithstanding the absence of any contract being executed between the shipowners and the Terminal and even though the Government was not a time charterer or a stevedore—professional or otherwise—the defendants nonetheless assert that the standard of an implied warranty incumbent upon a stevedore to provide workmanlike service should be similarly imposed upon the Terminal. Unless a time charterer expressly contracts to indemnify, "[t]he revolution taking place in the distribution of maritime risk has not yet saddled a time charterer with the implied warranty of workmanlike service." Allison v. Cosmos Steamship Corp., 331 F.Supp. 1319, 1320 (W.D.Wash.1971). See also, McNamara v. Weichsel Dampfschifffahrts A. G. Kiel, Germany, 339 F.2d 475, 478 (2d Cir. 1964); Drago v. A/S Inger, 194 F.Supp. 398, 410–411 (E.D.N.Y. 1961), aff'd 305 F.2d 139 (2d Cir. 1962). Moreover, when a party does not purport to be a professional stevedore, merely because it agrees to assume the responsibility for the removal of its own cargo from a vessel likewise does not give rise to any warranty of workmanlike service. Matson Navigation Co. v. United States, 173 F.Supp. 562, 564 (N.D.Cal.1959).

When reimbursement is grounded on *contractual* indemnity, the Court's application or consideration of concepts of "active"-"passive" or "primary"-"secondary" negligence is deemed inappropriate. Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp., *supra,* 350 U.S. at 132–133, 76 S.Ct. at 236–237;

Weyerhaeuser S. S. Co. v. Nacirema Operating Co., 355 U.S. 563, 567–569, 78 S.Ct. 438, 441–442, 2 L.Ed.2d 491 (1958); Italia Societa v. Oregon Stevedoring Co., 376 U.S. 315, 318–322, 84 S. Ct. 748, 750–753, 11 L.Ed.2d 732 (1964); Federal Marine Terminals, Inc. v. Burnside Shipping Co., Ltd., 394 U.S. 404, 414–422, 89 S.Ct. 1144, 1150–1154, 22 L.Ed.2d 371 (1969). However, in the absence of any contract, agreement or warranty between the defendants and the Government, there is no basis for recovery under the legal theory of contractual indemnity. Any restitution which might be forthcoming to the defendants must be predicated on noncontractual or tort indemnity. The Supreme Court in the foregoing decisions has specifically left unanswered the legal responsibilities and liabilities of parties under noncontractual indemnity.

In several pre-*Ryan* and post-*Ryan* cases lower federal courts have recognized tort indemnity for the injured party who was not *in pari delicto* or, at most, only passively negligent. In those cases the Supreme Court's proscription against discussion of the conduct of the respective parties is inapposite. See, *e. g.*, Standard Oil Co. v. Robins Dry Dock & Repair Co., 32 F.2d 182 (2d Cir. 1929); Jones v. Waterman S. S. Corp., 155 F.2d 992, 1000 (3d Cir. 1946); Tri-State Oil Tool Industries, Inc., 410 F.2d 178, 180–186 (5th Cir. 1969); Wallenius Bremen G.m.b.H. v. United States, 409 F.2d 994, 998 (4th Cir. 1969); Nikiforow v. Rittenhouse, 319 F.Supp. 697, 701–702 (E.D.Pa.1970). See also Shannon v. City of Anchorage, 429 P.2d 17 (Alaska Sup.Ct.1967).

A review of the record in the case at bar convinces me that the defendants' claim for tort indemnity must be dismissed on the facts as well as on the applicable law. There is uncontroverted evidence that the brow gangway when affixed to the SS Thunderbird was in excellent condition, structurally durable and adequate for the uses intended. Moreover, it was common knowledge in the maritime world that such a wooden gangway would loosen during its utilization, hence necessitating minor repairs and adjustments by the ship's crew.

While there is a conflict in the testimony of the witnesses on this point, I find that whether or not such periodic repairs were made the Government was not primarily liable or actively negligent. Any deterioration of the condition of the brow during the course of its usage would have been open, readily apparent and obvious to the ship's crew. It was incumbent upon the Chief Mate or his designated representatives to oversee the continued maintenance of the brow in a safe and a sound condition. By acquiring possession of the gangway, the ship agreed to and did, in fact, accept the responsibility for undertaking the restoration of the brow as the evening progressed. Utilization of a brow in a state of disrepair which was patently evident would be an unsafe practice and constitute active negligence by the defendants. The Government had no way of knowing of or preventing the use of the brow in a dangerous manner. The decision of Standard Oil Co. v. Robins Dry Dock & Repair Co., *supra*, does not compel a contrary result. The primary cause of the injuries here was not the installation of a defective gangway, but employment of a gangway in such a fashion that was inherently unsafe.

I do find that the ship's crew did make the necessary repairs but the principal cause of Coggins' fall was the steepness of the angle of the brow. In Salih v. Universal Cargo Carriers Corp., 147 F.Supp. 440, 442 (S.D.N.Y.1956), the Court concluded that where the angle of incline of the gangway relative to the dock was less than 45 degrees at all material times, the vessel was not unseaworthy.

The evidence in the instant case is uncontradicted that the angle of incline was excessively steep, ranging in approximations from at least 45 degrees to 50 or 60 degrees. I find the testimony of the Chief Mate on this point to be

probative evidence of a credible character establishing the unsafe manner in which the brow gangway was utilized. While there are allegations by the defendants that the rounded condition of the cleats was the fundamental factor in Coggins' falling, those statements are somewhat inconsistent with and contradictory of other remarks by the plaintiff.

But even assuming the cleats were rounded, I herein conclude that condition alone was not the prime cause of the accident. For the Chief Mate to permit his crew members to descend a brow that was placed at an angle of incline which he regarded as hazardously steep, this constituted affirmative or active negligence and bars recovery by the defendants. Even were this Court to find that pursuant to *Standard Oil Co.*, *supra,* the Government was required to provide a brow which was structurally designed to withstand the rigors of the defendants' loading for whatever the duration and that failure to supply such a brow constituted active negligence irrespective of whether necessary repairs were timely made or whether the obligation to undertake such repairs shifted to the defendants upon acquisition and utilization of the brow, the defendants were still actively negligent when they allowed their crew members to descend a brow which rested at an angle of incline far in excess of 45 degrees. Where two parties are both actively negligent, tort indemnity should be denied, for in effect the relief which defendants are seeking then sounds more in contribution, such relief which as a matter of law is precluded by Halcyon Lines v. Haenn Ship Ceiling and Refitting Corp., *supra.* The defendants' conduct precludes this Court from finding they have stated a cause of action upon which relief can be granted.

Whether sounding in contract or tort, the Government is not liable and obligated to indemnify the shipowners. Accordingly, the Government is entitled to a judgment dismissing the complaint.

Pursuant to Federal Rules of Civil Procedure, Rules 41(b) and 52(a), 28 U.S.C. Rules 41(b) and 52(a), the foregoing discussion constitutes my findings of fact and conclusions of law.