Herman D. HENDERSON, Plaintiff,

v.

S. C. LOVELAND CO., INC.,
Defendant,

v.

UNITED STATES of America,
Third-Party-Defendant.

No. 73–72–CIV–P.

United States District Court,
N. D. Florida,
Pensacola Division.

Sept. 23, 1974.

Fredric G. Levin, Pensacola, Fla., for plaintiff.

Dewey R. Villareal, Jr., and Nathaniel G. W. Pieper, Tampa, Fla., for defendant.

John J. McLaughlin, Admiralty and Shipping Section, Dept. of Justice, Washington, D.C., and William Stafford, United States Atty., Pensacola, Fla., for third-party-defendant.

## MEMORANDUM DECISION

ARNOW, Chief Judge.

This case was tried before the court on September 3rd and 4th, 1974. This memorandum decision is intended to serve as and contain the findings of fact and conclusions of law required by Rule 52, Federal Rules of Civil Procedure.

On May 16, 1972 the barge LOVE-LAND #5 arrived at the Pensacola Naval Air Station laden with a cargo consisting of one airplane, several helicopters and several boxes of spare parts. The barge was moored port side to the Allegheny Pier. The United States, through naval station civilian employees, set about opening the hatches preparatory to discharging the cargo.

The LOVELAND #5 is a seagoing barge, 195 feet in length, thirty-five feet in breadth with a depth of hold of eleven feet. Hatch coamings extended approximately six feet above the main deck. Her cargo compartment is one large box which is covered by eight roller hatch covers. The hatch covers are numbered one through eight, from forward aft. Covers one, four, five and eight are high hatch covers and capable of rolling over covers two, three, six and seven which are referred to as low covers. The high covers roll on one set of tracks and the low on another set of tracks so that many combinations of arrangements of the hatch covers are possible. Each hatch cover has a wheel near each of its four corners. The tracks just mentioned are similar to railroad tracks. The wheels on the LOVE-LAND #5 were flanged on one side of each hatch cover and unflanged, or smooth, on the other side.

The LOVELAND #5 was equipped with a hand operated winch at the forward end on the main deck with a cable long enough to reach to the after end of the barge. This hand winch and cable were intended to be used in opening and closing the hatch covers. There was a similar winch at the after end of the barge, but the evidence is in dispute whether there was a cable on the after winch on the date of the accident.

The naval station personnel came aboard the barge fairly early on the morning of the 16th and, by the use of the forward hand winch and cable, opened No. 8 hatch cover. After No. 8, there may have been an effort to open No. 7 although this did not appear clearly from the testimony. In any case, there is no doubt that No. 6 was to be opened and that the naval station personnel tried to open it using the hand winch and cable with which No. 8 had been opened. However, if they were successful in moving No. 6 cover at all, it was only for a very short distance. The decision was taken by the naval station personnel to attempt to open No. 6 by the use of a mobile crane which was intended to be used to discharge the cargo and which was therefore at hand.

The naval station personnel, specifically the plaintiff in this case, Mr. Henderson, assisted by Mr. Torok, Loveland's operations assistant, connected the

hook at the lower end of the purchase on the crane to a length of cable, the other end of which was connected to the pad eye on the after end of No. 6 hatch cover which. was the fitting to which lines were attached to open No. 6 hatch cover.

After the crane was connected to No. 6 hatch cover, Henderson and Torok moved to the No. 5 hatch cover, the next one forward, and stood upon it while the crane operator undertook to open No. 6 by swinging the boom of the crane in a way which was intended to tug No. 6 hatch cover forward under No. 5. The first tug by the crane did not move No. 6 hatch cover. The second tug, which was harder, did not move No. 6 hatch cover appreciably. The third tug, which was harder still, moved No. 6 hatch cover and started it rolling rapidly forward. The crane operator reversed the direction of swing of the crane boom and may have slowed the movement of the hatch cover somewhat but did not stop it with the boom. No. 6 hatch cover rolled all the way under No. 5 hatch cover and fetched it up against positive stops extending beneath No. 5 hatch cover with a crash, similar, according to one witness, to that to be heard when railroad cars are coupled together. The force of this blow was transmitted through No. 5 hatch cover to the abutting No. 4 hatch-cover next forward of it. No. 4 hatch cover had been undogged by the naval station personnel prior to the efforts to open No. 6 hatch cover and when No. 6 hatch cover fetched up against the stops on No. 5, No. 4 hatch cover was driven forward with a "billiard ball effect." No. 5 hatch cover did not move appreciably because it was still immobilized by dogs which fastened it to the hatch coaming.

Mr. Henderson was knocked off balance when No. 6 cover fetched up under No. 5 cover and stumbled forward a distance of perhaps eight or ten feet, eventually falling across the opening which had appeared between No. 4 hatch cover and No. 5 hatch cover and was perhaps three or four feet wide at this juncture. Henderson tried to catch himself by holding on to No. 4 hatch cover, but the momentum of his body swinging into the cargo box frustrated this effort. He fell about seventeen feet and landed on the boxes of spare parts at the bottom of the hold, suffering personal injuries which will be the subject of the damage portion of this trial which is scheduled for November 19th.

The United States' employee in general charge of the unloading operation was supply department superintendent Redditt. Next beneath him in the chain of command was supply department foreman Massey. In addition to these supervisory personnel from the supply department, there were several other supply department workmen, like Henderson, who had been specially assigned to the task of unloading this barge. The crane was provided by the Public Works Department as was the crane operator, Mr. Whitmire.

The United States having undertaken the task of discharging the barge with its employees was the responsible party in control of the unloading operation, including the preliminary opening of the hatch covers.

■ It seems clear beyond argument that the No. 6 hatch cover of the LOVE-LAND #5 was unseaworthy in that it was not capable of being opened by the use of the hand winch and cable or by the use of small amounts of force applied by the crane, so clear that, at hearing before the court after conclusion of the evidentiary hearing, all parties agreed it was unseaworthy. I, therefore, find that the barge was unseaworthy and that the unseaworthiness was a proximate cause of the accident involving Mr. Henderson.

■ The barge owner asserted in its answer that Henderson's own negligence was a proximate cause of his injuries but conceded at the argument that contributory negligence on Henderson's part had not been shown. The evidence disclosed that Henderson had never before worked on a barge equipped with roller hatch covers and had received no

instructions as to how they should be opened or how workmen should conduct themselves for safety's sake in the course of opening such hatch covers. Henderson stood in the area Mr. Torok had suggested to him as a safer one than the one he initially selected for himself. Although Mr. Torok was not knocked off balance by the blow resulting from the No. 6 hatch cover fetching up under No. 5, he, through other experiences, had learned to brace himself against the possibility of such a blow, whereas Mr. Henderson had not. Therefore, I find that Mr. Henderson was not negligent in such a way as to cause or contribute to the accident.

■ As to limitation of liability, another defense asserted by the barge owner, the evidence indicated that on April 8, 1972 at a loading port one of the barge owner's operations assistants experienced difficulty in opening the covers of the barge and in using the winches on the barge and made a report to this effect to the headquarters of the barge owner. It appears that after the barge discharged the cargo it was loading on April 8th it was under repair at Norfolk at some time during a period of about two weeks in the latter half of April. But the evidence does not show specifically that the No. 6 hatch cover or the winches were repaired or, indeed, that they were operated or tested at the shipyard. From the shipyard the barge proceeded to load the cargo which it brought to Pensacola at Philadelphia and Aberdeen, Maryland. The evidence shows that the No. 6 hatch cover was not opened at either of the two loading ports. There is no evidence, or, at least, insufficient evidence to establish that the difficulty experienced with hatch cover No. 6 referred to in the report made to defendant about April 8, 1972, was ever repaired from that date through the date of the accident on May 16, 1972. As a result, I find that the barge owner has not sustained its burden of proving freedom from privity with and knowledge of the unseaworthy condition which I have found was one of

the proximate causes of the accident. I find that the ship owner is not entitled to limit its liability with respect to this accident.

■ With respect to the barge owner's claim for *Ryan* indemnification in connection with this accident, I find that the United States planned to and undertook the functions of a stevedore in connection with the discharge of the cargo of the LOVELAND #5 at Pensacola Naval Air Station on May 16, 1972. In this connection, the United States contends that, as it had agreed to load and unload its own cargo, it did not warrant its professional competence, and cites Coggins v. James W. Elwell & Co., Inc., 356 F.Supp. 612 (E.D.Pa.1973); Stevens v. Pacific Inland Navigation Co., 220 F.Supp. 654 (D.Or.1963); Matson Navigation Co. v. U. S., 173 F.Supp. 562 (N.D.Cal.1959). There has not been cited before me, nor has research disclosed, any definitive decision of the U. S. Circuit Court of Appeals for the Fifth Circuit, or of the Supreme Court of the United States, on this point. I conclude that the correct rule of law is that set forth in decisions cited by the defendant and that, as the United States undertook to perform, and was performing, as a stevedore, it had the duties a stevedore would have under the law, including the duty to perform in a workmanlike manner. Greene v. Vantage Steamship Corp., 466 F.2d 159 (4 Cir. 1972); Rogers v. United States Lines Co., 303 F.2d 295 (3 Cir. 1962), cert. den., 371 U.S. 876, 83 S.Ct. 148, 9 L.Ed. 2d 114 (1962); Pilato v. States Marine Corp. of Delaware, 158 F.Supp. 221 (E. D.N.Y.1957). I find that the United States, through the naval air station employees it assigned to the task of discharging the cargo of the LOVELAND #5, as stevedore, breached its warranty of workmanlike service to the vessel owner, S. C. Loveland Company. The United States sent Henderson, the plaintiff in this case, to do the work of a longshoreman or rigger in connection with the opening of the roller type hatch covers on the barge LOVELAND #5.

Henderson had never worked on a barge with hatch covers of any kind on it before, his prior experience having been limited to cutting loose the tie downs on cargo on flat deck barges. He had received no instructions how to conduct himself in the course of his work on the LOVELAND #5, or any barge with roller type hatch covers, and no warning about safety hazards to be encountered on such barges. The other employee of the naval air station principally concerned in the opening of the hatches was the crane operator, Mr. Whitmire. Mr. Whitmire was an experienced crane operator, but he had never previously been called upon to try to open roller hatch covers with a crane. The government's foreman was, at the relevant times, away from the barge, having been sent by the government's superintendent to try to find a welder or burner whose services would be needed to burn some of the tie down which held the cargo in the barge in place. And the government's supervisor left the details of the task to the crane operator. The government had available experienced riggers in its public works department who might have been called upon to do the job and who were in fact called upon after the accident to do it. The method undertaken by Mr. Whitmire to open the hatch cover with his crane was to swing the boom of the crane, with the purchase of the crane's lifting tackle partly lowered and with a single cable running from the hook on the lower block of the crane's lifting tackle to a pad eye on the cover of the hatch to be opened. The lower block and hook weighed between 1,500 and 2,000 pounds. The crane operator swung his boom once with no noticeable results, then harder a second time, still with no noticeable results, and harder still a third time during which the hatch cover moved and moved rapidly. The government had not taken steps to secure the crane cable against undesired motion since the crane shackle was not adjusted to short lead. Neither had the government taken steps to prevent the hatch cover from rolling fur-

ther than it was meant to do, as by attaching a preventer to the hatch cover designed to restrain it from rolling further forward, a precaution which expert witness stevedore Leever agreed should have been taken. Furthermore, the government employees had unnecessarily undogged hatch cover No. 4. Only the crane operator knew how much force he was applying to the hatch cover, if, indeed, he knew. He had not intended that the hatch cover would be stopped by colliding with the underside of the No. 5 hatch cover so that, in effect, he applied more force than he intended to use and produced a result that he had not planned. Based upon the evidence as a whole, I am convinced, and find, that the United States breached its warranty of workmanlike service and that the breach thereof was a proximate cause of the injury suffered by Mr. Henderson.

 I further find that the conduct of the barge owner in this case was not sufficient to preclude the recovery of indemnity. I have found that the barge was unseaworthy at the relevant time in that the No. 6 hatch cover did not move when the usual technique for opening it was used. I take note of the fact that Mr. Torok, Loveland's operations assistant, was at hand and was on the barge and on top of the hatch covers with Mr. Henderson when the arrangements were made and the rigging was accomplished to undertake the opening of the hatch. I also note that Torok talked with Henderson about the manner in which the crane cable was to be attached to the hatch cover, suggested to Henderson an area in which to stand which, in Torok's judgment, was safer than the place in which Henderson had previously been standing, suggested to Henderson that he give the crane operator the initial signal to try to move the hatch cover with the crane, and once the hatch cover started moving suggested to Henderson that the latter tell the crane operator to slow the hatch cover down. But I am convinced, from a consideration of the evidence as a whole, that Torok's participation was

relatively minor and unimportant. He was not the responsible person in charge of the operation and indeed had no authority to take charge of the operation. Certainly he was not preventing or hindering or actively interfering with the operation. Torok was not ordering the work done or directing how it should be done—at the most, he was suggesting to Henderson when it was appropriate to proceed with the action which the United States had decided to undertake and was pursuing. Torok's purpose aboard the barge was to watch the interests of the owner with respect to ascertaining when the barge was damaged either by stevedores or by tugboats, getting the facts, and making sure that Loveland could address claims for the repairs of such damage to the appropriate party. He had other duties, it is true, but he was mainly assigned to inspect the barge and its equipment and report damage or problems with respect to it. He was not assigned to oversee or arrange for the opening and closing of hatch covers or the discharging of cargo. Nor did the government's supervisory personnel and crane operator rely on any communications with Torok.

▉ The United States argued that the unseaworthiness of the hatch cover was itself sufficient conduct to preclude the giving of indemnity, but this unseaworthiness was known to the United States well before the commencement of the crane operation which resulted in the accident and before the accident here involved. The United States employees on the scene knew they had not been able to work the hatch cover with the hand winch installed on the barge LOVELAND #5 for the purpose of opening hatch covers and knew that neither of the first two pulls with the crane had succeeded in moving the hatch cover. And the United States had to know that when a hatch cover did not respond to the efforts, that there was something defective about it. There is, of course, no duty to warn of defects which are already known. The United States could have avoided the incident simply by stopping the operation after the first or second pulls when the crane failed to achieve the desired result and looking to see if the cause of the failure of the hatch cover to move could be learned and correcting it if possible, or if not, simply advising Loveland that a repairer or someone other than the United States would have to come and clear the trouble.

If it were open to me to do so, I would require the United States and Loveland to share equally the burden of Mr. Henderson's damages as I feel each is about 50% responsible. But as I read Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp., 342 U.S. 282, 72 S.Ct. 277, 96 L. Ed. 318 (1952), and Cooper Stevedoring Company v. Fritz Kopke, Inc., 417 U.S. 106, 94 S.Ct. 2174, 40 L.Ed.2d 694, (1974), this is not a case in which contribution may be required. And there is no doubt the United States brought the unseaworthiness of the barge into play. Crumady v. The Joachim Hendrick Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed. 2d 413 (1959).

In view of the foregoing, Henderson is entitled to recover all of his damages from the barge owner, Loveland, and Loveland is entitled to be indemnified by the United States for the amount of Henderson's damages plus defense costs.

The trial on the question of amount of Henderson's damages will commence at 9:00 a. m. on Tuesday, November 19, 1974.